**Juan A. GARCIA AYALA, Plaintiff,**

v.

**BRISTOL MYERS–SQUIBB MANUFACTURING CO., Defendant.**

**No. Civ. 95–1850(RLA).**

United States District Court,
D. Puerto Rico.

Dec. 19, 1997.

---

Ariel O. Caro Pérez, Rubén Colón Morales, Law Offices Alvaro R. Calderon, Jr., San Juan, Puerto Rico, for plaintiff.

Anita Montaner Sevillano, McConnell Valdes, San Juan, Puerto Rico, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ACOSTA, District Judge.

Plaintiff instituted this action alleging that he was terminated from employment due to a disabling mental condition in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112, and various local provisions. Defendant has moved the court to enter summary judgment dismissing the federal cause of action which we hereby dispose of as set forth below.

### ADA

ADA constitutes a comprehensive legal framework seeking to eradicate discrimination in employment of individuals with either physical or mental disabilities. Specifically, employers covered by the statute[1] may not discriminate against employees with a disability who are otherwise qualified to perform their jobs. 42 U.S.C. § 12112(a). *See also Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir.1996).

### BURDEN OF PROOF

When no direct evidence of discrimination is available, plaintiffs in ADA suits may utilize the burden shifting paradigm established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Jacques v. Clean–Up Group, Inc.*, 96 F.3d at 511. Utilizing this approach, in order to prevail, plaintiff in this action would need to establish that at the time of dismissal

he was: (i) disabled within the meaning of ADA; (ii) qualified to perform the essential functions of his job with or without reasonable accommodations, and (iii) terminated by an entity covered by the statute.

A presumption then arises that defendant engaged in discriminatory conduct and the burden shifts to the employer to "articulate a legitimate nondiscriminatory reason for the employee's termination." *Pages–Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 536 (1st Cir.1996) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993)); *Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 334 (1st Cir.1997); *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996).

Once the defendant presents nondiscriminatory grounds for having taken the adverse action, the presumption disappears and plaintiff must come forth with evidence showing that the proffered reasons were both false and a pretext for discrimination. *See Ruiz v. Posadas de San Juan Assoc.*, 124 F.3d 243, 247 (1st Cir.1997) (plaintiff must establish that alleged reason was pretextual and that true motive was discrimination); *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 673 (1st Cir.1996) (plaintiff must prove not only that the reasons set forth by the employer were false but also that termination was prompted by discriminatory animus); *Hidalgo*, 120 F.3d at 335 (reason given was false and discrimination was the real motive).

> Thus, once the employer articulates a legitimate, nondiscriminatory reason for laying off the plaintiff, to avoid summary judgment, the plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for laying off the plaintiff is a pretext, and (2) that the true reason is discriminatory. While the plaintiff may rely on the same evidence to prove both pretext and discrimination, the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus.

---

**1.** Employer is defined as "a person engaged in an industry affecting commerce who has 15 or more employees". 42 U.S.C. § 12111(5)(A).

*Udo v. Tomes,* 54 F.3d 9, 13 (1st Cir.1995) (citing *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995)).

The defendant's obligation is merely one of "production"; the burden of proof always remains with the plaintiff. *Hidalgo,* 120 F.3d at 335.

## SUMMARY JUDGMENT

Courts may enter summary judgment in cases where no genuine issue as to any material fact exists. *Cadle,* 116 F.3d at 959. Not all factual disputes preclude summary judgment. *Mulero–Rodriguez,* 98 F.3d at 673; *Fennell,* 83 F.3d at 535.

> For the purpose of summary judgment, an issue of fact is genuine if it may reasonably be resolved in favor of either party. For the same purpose, material facts are those which possess the capacity to sway the outcome of the litigation under the applicable law.

*Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997) (citations and internal quotation marks omitted).

In ruling on a summary judgment petition, the court will consider the record in the light most favorable to non-movant indulging in all possible inferences in its favor. *Cadle,* 116 F.3d at 959.

In this case summary judgment is appropriate "if the record is devoid of adequate direct or circumstantial evidence of the employer's discriminatory intent." *Pages–Cahue,* 82 F.3d at 537. *See Hidalgo,* 120 F.3d at 335 (plaintiff must present evidence indicative of discriminatory animus, to avoid summary judgment); *Pages–Cahue,* 82 F.3d at 537 (evidence as a whole must support inference that termination was prompted by discrimination).

Further, when examining the evidence for summary judgment purposes the burden shifting mechanism need not be rigidly fol-

lowed but rather the record will be considered in *toto.*

> On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.

*Fennell,* 83 F.3d at 535.

## THE FACTS[2]

The following material facts are not in controversy.

1. Plaintiff JUAN GARCIA AYALA began working at SQUIBB on **September 9, 1974.** At the time of his dismissal on **March 28, 1994** plaintiff worked as a chemical operator.

2. Plaintiff worked on a rotating shift basis between day and night.

3. In **December 1993** plaintiff went to LUCILA BERRIOS, a nurse at SQUIBB's facilities, for consultation. The nurse recommended that plaintiff see a psychiatrist and made an appointment for him with a psychiatrist at INSTITUTO NEUROSICODINAMICO.

4. Plaintiff visited DR. LOURIDO at INSTITUTO NEUROSICODINAMICO on **January 19, 1994.** It was the first time plaintiff visited a psychiatrist. DR. LOURIDO diagnosed a major depression and ordered plaintiff to undergo a partial hospitalization for three weeks.

5. During his partial hospitalization plaintiff was treated mainly by DR. CARLOS O. PEREZ CORTES, a psychiatrist.

6. Plaintiff was under paid medical leave of absence during the entire partial hospitalization period.

7. Plaintiff was discharged from the partial hospitalization on **February 25, 1994.**

**2.** Because of their significance the pertinent dates have been highlighted.

**MARCH 1994**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |  |  |

8. On **March 8, 1994** plaintiff was seen at the INSTITUTO NEUROSICODINAMICO for the first time after his discharge.

9. On **March 8, 1994** DR. PEREZ CORTES advised SQUIBB in writing to avoid assigning plaintiff to night shifts because it would be impossible for plaintiff to give 100% of his capabilities, due to the medication he was receiving as part of his treatment.

10. Plaintiff returned to work at SQUIBB on **Wednesday, March 9, 1994** and worked the day shift for one week until **Wednesday, March 16, 1994.**

11. On **Thursday, March 17, 1994** plaintiff did not go to work but instead went to the office of DR. PEREZ CORTES without an appointment. Plaintiff indicated to the psychiatrist that he was feeling very depressed, anxious and nervous and could not make it to work. DR. PEREZ CORTES asked his secretary to prepare a medical certificate for two days' rest and asked plaintiff to return for treatment within the next two days.

12. There are no entries in DR. PEREZ CORTES' records indicating that plaintiff went back to see him as ordered.

13. Plaintiff was absent from work on **March 17 and 18, 1994.** During those two days and the two subsequent days SQUIBB did not receive any type of communication from plaintiff.

14. On **Monday, March 21, 1994** plaintiff showed up to work at SQUIBB at 10:00 p.m. but was not allowed to punch his time card or go to his work station. ELIUD GARCIA, plaintiff's supervisor, advised plaintiff to return the following day to meet with DOMINGO ROSADO, production manager.

15. On **March 21, 1994** plaintiff refused to provide ELIUD GARCIA with a medical certificate.

16. On Tuesday, **March 22, 1994** plaintiff showed up at work at 10:00 p.m. but was not authorized to come in because an evaluation of his case was being made which was not concluded. Plaintiff was advised to come back the following day at 9:30 a.m. for a meeting.

16. The following day, Wednesday, **March 23, 1994** plaintiff met with DOMINGO ROSADO to discuss his **March 17 and March 18, 1994** absences.

17. On **March 27, 1994,** his birthday, plaintiff again became depressed, anxious and irritable. He took more than 12 Zanax pills that night and drank excessive alcohol and was totally out of control.

18. On **March 28, 1994,** DR. PEREZ CORTES ordered plaintiff's immediate involuntary hospitalization in a psychiatric institution. The certificate indicated that plaintiff was "totally out of control" and "dangerous to himself".

19. On **March 28, 1994,** plaintiff was involuntarily admitted at FIRST HOSPITAL PANAMERICANO's psychiatric ward where he remained until **April 18, 1994.** At discharge plaintiff was diagnosed with bipolar disorder, hypomanic phase, and alcohol dependency. He was prescribed Lithium.

20. DOMINGO ROSADO issued a memorandum on **March 28, 1994** which summarized the events which transpired from **March 17 through 21, 1994** including his meeting with plaintiff and recommending plaintiff's termination.

21. Plaintiff was notified of his termination from employment by letter dated **March 28, 1994,** sent via certified mail to his physical address.

22. Plaintiff learned of his termination from employment during his stay at FIRST HOSPITAL PANAMERICANO.

23. Plaintiff was granted Social Security disability benefits due to his mental condition.

24. Social Security disability benefits were granted effective **January 24, 1994** which appeared in plaintiff's petition as the date of the onset of his disability.

25. Plaintiff had an extensive work record of absenteeism at SQUIBB which can be summarized as follows:

a. Memorandum dated **June 27, 1991** indicating that from **January 28 to June 24, 1991** plaintiff had been absent a total of **16** days and had arrived late on **6** separate

occasions. Plaintiff was **admonished** that failure to improve this conduct may prompt disciplinary measures.

b. A written reprimand was issued on **September 25, 1991** due to plaintiff being absent an additional **6** times in the period from **July 28 to September 22, 1991.** According to the letter, after having being suspended from **September 17 to 19,** plaintiff was again absent on **September 20, 1991.** Plaintiff was **admonished** that if his absenteeism continued he could be dismissed permanently from his employment.

c. A memorandum of an **October 9, 1991** meeting held at plaintiff's request to discuss plaintiff's concern with recent disciplinary measures and his future at SQUIBB indicates that plaintiff was once again reminded of his high absenteeism record and **forewarned** that future absences might result in his dismissal.

d. On **May 13, 1993** plaintiff was issued another written reprimand. This document indicates that from **April 20, 1992 through April 18, 1993** plaintiff had been absent a total of **292 hours.** The letter advised plaintiff that due to his past record, the reprimand was part of a "**progressive Disciplinary Action**".

e. On **July 19, 1993** plaintiff was issued another written reprimand. It stated that after the May 21, 1993 meeting, plaintiff had been absent on **June 4, 23, 24 and 25** as well as on **July 9, 1993.** The absenteeism record for the years 1990 through 1993 was summarized. Plaintiff was informed that due to his continuous tendency for excessive absences, he was suspended for three days commencing on **July 20, 1993.** Additionally, the letter stated: "[i]f you continue with this tendency of absences you may be **permanently suspended** from employment and salary." (emphasis ours).

f. In a **July 20, 1993** memorandum summarizing the meeting to discuss the three-day suspension, DOMINGO ROSA-

DO indicated that upon plaintiff's request for **reconsideration** due to his economic situation—a recent attachment/garnishment of 25% of his salary—the suspension was set aside. Plaintiff was advised that the suspension had been brought about by the **progressive disciplinary action** being taken in his case. Plaintiff was admonished that in the event that he continued to be absent he might be "**permanently suspended from employment and salary without having a temporary suspension, which was the initial intention of this disciplinary action.**" (emphasis ours).

g. On **January 10, 1994** another memorandum was issued regarding plaintiff's absenteeism. It indicated that plaintiff had been absent on **November 16 and 17, 1993.** Reference was again made to his prior absenteeism record and plaintiff was reminded that if the situation continued he would be "**permanently suspended from employment and salary.**" (emphasis ours).

### ARGUMENT

For purposes of disposing of defendant's summary judgment, we will assume that plaintiff was qualified for his position at the time of his dismissal[3] and that he has presented sufficient evidence to establish a prima facie case of discrimination pursuant to *McDonnell Douglas.* We will initially examine the nondiscriminatory reasons for termination advanced by defendant to ascertain whether or not defendant has rebutted the presumption of discrimination. If so, we will proceed to ascertain whether or not plaintiff has successfully established that these grounds are merely a sham to disguise discrimination.

■ Defendant's non-discriminatory reasons for terminating plaintiff from employment are well documented in the letter of dismissal as well as in the memorandum

---

**3.** Defendant claims that plaintiff was not "otherwise qualified" under the statute since he only worked for six days after his partial hospitalization despite being assigned the day shift during those days. Additionally, defendant contends that plaintiff is estopped from denying his total inability to work in **March 1994** since he was

found totally disabled by the Social Security since **January 1994.** *See Simon v. Safelite Glass Corp.,* 128 F.3d 68 (2nd Cir.1997) (plaintiff in discrimination case judicially estopped from claiming qualified to perform duties of position in view of allegation of total disability made to Social Security Administration).

prepared by DOMINGO ROSADO recommending plaintiff's permanent suspension. In pertinent part, the termination letter dated **March 28, 1994** reads:

Upon having conducted an investigation of the incidents which occurred on March 22 and 23, 1994, wherein you made expressions of violence against management personnel of the Company and requested that another employee state that he had observed an event that you know did not occur, we have no other alternative than to terminate your employment, effective on this same date.

In making this decision we have analyzed and taken into account the contents of your entire Human Resources file, including your deficiencies in being absent from work frequently without notification, in violation of the standards of the company and other deficiencies of a similar nature.

(translation ours).

A memorandum issued by DOMINGO ROSADO on **March 28, 1994** summarized the events of the prior week and recommended plaintiff's dismissal on the following grounds:

1. The existence of various admonishment letters due to plaintiff's absences. These are dated **June 27, 1991, September 25, 1991, October 15, 1991, May 13, 1993 and January 10, 1994.**

2. Progressive disciplinary measures such as temporary suspension were exhausted in letters dated **July 19, 1993 and February 20, 1993.**

3. Plaintiff was absent on **March 17 and 18, 1994** and failed to communicate with the supervisor.

4. Plaintiff offered contradictory versions as to his **March 17 and 18, 1994** absence.

5. Plaintiff expressed aggressive gestures to plant personnel.

6. In certain way makes aggressive expressions to me [ROSADO] which could be interpreted as intimidation.

■ We find that based on plaintiff's personnel record as well as the events leading up to his dismissal, defendant has rebutted

the presumption of discrimination. Accordingly, plaintiff now bears the burden to establish that the reasons proffered by defendant are false. As evidence of pretext and discriminatory animus plaintiff argues that despite his recurrent absenteeism problems he was not dismissed until accommodation to the day shift was requested. However, it is not disputed that due to his chronic absenteeism plaintiff had been previously suspended without pay and placed on "Progressive Disciplinary Action". Furthermore, all written communications calling his attention to his failure to appear at work specifically cautioned that future absences might result in his **permanent** suspension. As indicated by DOMINGO ROSADO in his recommendation, all progressive disciplinary measures had been exhausted to no avail. Given the extensive record and the clear admonitions given plaintiff we fail to find that utilizing his attendance record as additional grounds for his termination was a pretext.

It is also undisputed that plaintiff failed to appear at work on **March 17 and 18, 1994** without having given any prior notice or otherwise contacting his employer during his absence. It is further uncontroverted that, despite ELIUD GARCIA's request for plaintiff to produce a medical certificate, plaintiff refused to furnish it. Plaintiff **did not** provide the medical certificate on **March 21, 1994** to either ELIUD GARCIA[4] or the supplementary nurse[5] when he first reported to work after his two-day absence. Although the parties cannot agree on the specific date on which the certificate was provided to SQUIBB personnel, plaintiff concedes that it was not until "[o]ne or two days after [March 21, 1994 that he] handed his medical certificate to Mr. Rosado". Plaintiff's Statement of Facts No. 20.

■ Failure to timely produce the medical certificate represents additional justification of defendant's acts. ADA does not exempt employees from complying with their employer's administrative policies.

The dismissal letter further mentions plaintiff's request to another employee to lie. Since plaintiff has failed to object to this

---

4. Plaintiff's deposition vol. III at 72.

5. Plaintiff's deposition vol. III at 78.

particular assertion we find that it constitutes additional grounds for defendant's decision to permanently suspend him.

Plaintiff met with DOMINGO ROSADO on **March 23, 1994.** According to plaintiff, during the conversation he informed MR. ROSADO that MR. ROSADO was not helping plaintiff; that he felt that MR. ROSADO was harassing him and that he thought MR. ROSADO had been the worst boss he had ever had.[6] Plaintiff denies any aggressive behavior during the course of this meeting and emphasizes that at its conclusion they both shook hands. However, whether or not MR. ROSADO felt threatened or intimidated during the course of the meeting is a subjective belief which he confirmed during his deposition.

Additionally, there is evidence in the record of "aggressive gestures" to other personnel which was also listed in the dismissal letter as grounds for the termination. In his deposition plaintiff admitted that when ELIUD GARCIA did not allow him to punch his time card he became "very upset"[7] and "exalted"[8] and might have raised his voice.[9]

According to SQUIBB's Employee Manual, disciplinary measures and dismissal may result from disobeying or being disrespectful to supervisors, being absent without advising the employer or frequent absences. There is ample evidence of plaintiff's infringement of the Manual provisions which justify defendant's decision.

Plaintiff has failed to establish that the reasons given for this final disciplinary action were false and that the dismissal was motivated by his disability. The employer presented abundant evidence to establish that its decision was a culmination of a progressive disciplinary plan prompted by violations of its Manual.

Courts will not sit as "super personnel" officers when reviewing challenges to employers, administrative determinations. Employers are at liberty to dismiss employees at will which means that terminations can be for no reason at all. Further, there is no requirement that the reasons proffered be fair. The only limitation imposed by federal law is that the termination not be based on impermissible discriminatory grounds. *Ruiz v. Posadas,* 124 F.3d at 249 and *Hidalgo* 120 F.3d at 337 (quoting *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991)).

Accordingly, we find that plaintiff failed to establish that the reasons proffered for his dismissal were false and that termination was prompted by his disabling mental condition.

### CONCLUSION

Based on the foregoing, defendant's Motion for Summary Judgment (docket No. 23) is hereby **GRANTED**[10] and the claims asserted under ADA are hereby **DISMISSED.**

It is further ORDERED that since the federal claim has been disposed of, all supplemental claims are likewise **DISMISSED** without prejudice. *See Ruiz v. Posadas de San Juan.*

Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

6. Plaintiff's deposition vol. III at 88.

7. Plaintiff's deposition vol. III at 72.

8. Plaintiff's deposition vol. III at 81.

9. Plaintiff's deposition vol. III at 80.

10. *See also* Plaintiff's Opposition ... (docket No. 28) and defendant's Reply ... (docket No. 40).