**Robert E. HIGGINS, Plaintiff,**

v.

**NEW BALANCE ATHLETIC SHOE, INC., Defendant.**

**No. Civ. 97–273–B.**

United States District Court,
D. Maine.

Oct. 14, 1998.

ORDER AND MEMORANDUM
OF DECISION

BRODY, District Judge.

In this civil rights action, Plaintiff Robert E. Higgins alleges that Defendant New Balance Athletic Shoe, Inc. discriminated against him on the basis of his sex, his sexual orientation, his disability, and his whistleblowing activities. Plaintiff brings this action under Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S .C. § 2000e *et seq.*,[1] Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, and the Maine Whistleblower's Protection Act ("MWPA"), 26 M.R.S.A. § 831 *et seq.* Before the Court is Defendant's Motion for Summary Judgment on all Counts of Plaintiff's Complaint. For the reasons stated below, Defendant's Motion is GRANTED.

## I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affadavits." Fed.R.Civ.P. 56(c). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

Burton G. Shiro, Law Offices of Shiro & Shiro, Waterville, ME, for Plaintiff.

Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, ME, for Defendant.

1. Although Plaintiff did not cite Title VII in his Complaint, the factual assertions in the Complaint formulated an allegation of hostile work environment sexual harassment and Plaintiff later clarified the applicability of Title VII in his Memorandum of Opposition to Defendant's Motion for Summary Judgment and his Supplement to that Memorandum.

## II. FACTS

Defendant hired Plaintiff to work at its shoe manufacturing plant in Norridgewock, Maine on June 11, 1986 and terminated Plaintiff on January 4, 1996. During the latter part of his tenure with Defendant, Plaintiff was assigned to a production team performing slip lasting (slipping the product up and around a plastic shoe last for production).[2] Plaintiff is homosexual and has a hearing impairment that has required him to use a hearing aid since 1989. Defendant issued a performance review identifying Plaintiff as a "very good" overall employee on October 2, 1995.

Plaintiff suffered frequent verbal and physical abuse at the hands of numerous co-workers.[3] Co-workers would constantly holler, swear, and otherwise verbally demean him. Co-worker Wayne McGowan ("McGowan") on numerous occasions addressed Plaintiff with statements such as "You eat the shit out of men's ass-holes," "You faggot," and "You fag." In addition, McGowan placed a sign on Plaintiff's desk that read "Blow jobs. 25 cents." Co-worker Eric Caouette often referred to Plaintiff as "faggot," "you dumb fuck," and "you stupid fuck." Other employees expressed distaste for working with Plaintiff with comments like "he'll give us AIDS."

One day, while Plaintiff stood at a urinal in the restroom, co-worker Ron Heald came up behind him, shook him violently, and said "I'll kill you." Employees intentionally threw hot cement at Plaintiff, snapped rubber bands on Plaintiff's body, and stomped on strategically placed mustard and ketchup packets causing the substances to spray onto Plaintiff when he walked by.

Many of these incidents occurred either in the presence of, or within earshot of, Plaintiff's production team supervisor, Ronn Plourde ("Plourde").[4] Plaintiff repeatedly reported these incidents to Plourde and to the Human Resources Office, but no action was ever taken despite the existence of an internal corporate anti-harassment policy prohibiting harassment based on, among other things, an employee's sexual orientation.

Plaintiff claims that he requested a fan for his work station because the conditions of extreme heat in his work area caused him to perspire and the perspiration in turn caused moisture damage to his hearing aid. Plaintiff alleges that Defendant failed to provide him with a fan, despite the fact that other employees had fans. In addition, Plaintiff allegedly requested that Defendant move a nearby loudspeaker because its presence made it harder for him to hear, and Defendant failed to do so. Plaintiff claims that he told Defendant that resolution of these issues was essential because his hearing impairment interfered with his ability to communicate with his co-workers, making it difficult for him to perform his job effectively and efficiently.

Defendant contends that, while it did know of Plaintiff's hearing impairment, Plaintiff requested no form of reasonable accommodation relating to a loudspeaker, a fan, or any other device. Defendant denies that Plaintiff ever stated that his hearing impairment affected his ability to work or to communicate, and asserts that it gratuitously instructed Plaintiff's team members to reposition themselves so they could better communicate with him.

2. Unlike other shoe factories, Defendant's employees are paid according to a formula related to a production team's weekly output. When it converted to a production team system, Defendant invested in team communication training and development so that production teams would be able to solve their own production problems without management intervention. Because these production teams are responsible for both product quantity and quality, Defendant contends it is essential that team members communicate effectively with each other about the quality of the product, work cooperatively, and resolve problems.

3. The record does not indicate when these incidents commenced or occurred.

4. Plaintiff avers that Plourde himself would sometimes gesture toward him in a degrading and humiliating manner, using his hands, body movements, and voice to indicate that Plaintiff was gay. Plaintiff further alleges that before Plourde was promoted to a supervisor position, Plourde worked on Plaintiff's work team and told Plaintiff "don't get too close—because of your kind."

Plaintiff allegedly complained to Defendant about incidents and conditions that he believed were unsafe or illegal, including: (1) Defendant's representations that a product was "Made in the USA" when it was actually made elsewhere; (2) employee alcohol use on the job; (3) employee drug use; (4) employee theft; (5) fires in the roughing machines, steaming machines, and drying machines; (6) defective smoke detectors; (7) frequent power overloads and fires in the electrical outlets; (8) a leaky roof that caused water to fall on electrical equipment; (9) unsanitary bathroom conditions; (10) chemical and cement fumes that interfered with Plaintiff's breathing; (11) defectively timed steamer which caused eye irritation; (12) Defendant's failure to provide Plaintiff with fan or move the loudspeaker; and (13) the abusive behavior of Plaintiff's co-workers. Plaintiff does not indicate when, during his ten year tenure, he made these complaints.

Defendant asserts that Plaintiff never made any complaints to Defendant indicating that the conditions of his employment and/or other activities engaged in by Defendant violated some state or federal law. Defendant claims that it fired Plaintiff for continued poor job performance and insubordination. According to Defendant, on January 4, 1996, Plaintiff refused to communicate with a fellow team member after being instructed by a supervisor to do so. Defendant's version of events is set forth in the following memorandum drafted by Plaintiff's supervisor on the date of Plaintiff's termination:

[ ] called me over to her work station around 10:00 a.m. to tell me that Robert Higgins refuses to talk to her when she asks him a question concerning work. I went by Roberts [sic] work station and asked him about it. He said he wasn't going to talk to her, she swears at him. I said you guys have to start communicating, and this has got to stop.

I brought [ ] down to my office and asked her if she swore at him. She said no. I also told her that this has got to stop. She said she's trying.

I along with the Plant Manager and the H.R. Representative to discuss what had taken place [sic]. We reviewed Robert's record as he had received a warning in November and also in May for failing to work effectively as a team. He had been counselled numerously in the past, and today he refused to speak to her. Based on all of this information, the decision was made to terminate Robert immediately.

Defendant contends that Plaintiff's behavior on January 4 was part of a pattern of non-cooperation and argumentativeness that disrupted his team's output.[5]

Plaintiff offers a different version of what transpired on the day of his termination. He alleges that a fellow team member, Melanie Vitalone ("Vitalone"), left her work station to talk with her boyfriend.[6] In her absence, boxes of shoes piled up at her work station and this caused a disruption in the production line. According to Plaintiff, when Vitalone returned to her work station, she noticed the accumulation of boxes at her station and wrongfully started yelling at and blaming Plaintiff, calling him "Fag Boy" and "You Stupid Fuck." Plaintiff claims he asked Vitalone to stop swearing at him and to try to listen to him, but she walked off. Plaintiff asserts that he resumed regular communication with Vitalone after the incident.

Plaintiff contends that Defendant discriminated against him in the terms and conditions of his employment when it failed to reasonably accommodate his hearing impairment and when he was subjected to hostile

---

5. Defendant issued written warnings to Plaintiff on May 10, 1995, and November 28, 1995, criticizing his ability to work as a team member and warning that future problems might result in termination. These warnings cite Plaintiff for "argu[ing] with fellow team members," "making moral judgment[s]" regarding a co-worker's pregnancy, "yelling remarks," and being otherwise "argumentative," "uncooperative," and "disrupt[ive]." Plaintiff refused to sign either warning.

6. According to the record, Plaintiff and Vitalone did not have a cooperative working relationship. Plaintiff alleges that Vitalone would swear at him, berate him, yell at him, and blame him for her mistakes, and that Plourde and Human Resources Representative Elizabeth Hook dismissed his requests for intervention and warned him that further complaints about Vitalone would result in his termination.

work environment sexual harassment. Plaintiff also contends that he was subject to retaliatory discharge because he complained to Defendant about allegedly unsafe and illegal conditions, including his harassment by other employees and problems related to his hearing impairment. Plaintiff additionally argues that Defendant discriminated against him on the basis of his sexual orientation.

## III. DISCUSSION

### A. Disability Discrimination

Plaintiff alleges that Defendant discriminated against him in the terms and conditions of his employment in violation of the ADA, the MHRA, and the Rehabilitation Act when it failed to reasonably accommodate his request for a fan in his work area and his request that a loudspeaker in his work area be relocated.

### 1. ADA and MHRA

Plaintiff's ADA and MHRA claims are subject to identical legal analysis. *See Abbott v. Bragdon,* 107 F.3d 934, 938 (1st Cir.1997) ("The Maine Supreme Court has indicated that analogous federal law informs the interpretation of the MHRA.") (citing *Bowen v. Department of Human Services,* 606 A.2d 1051, 1053 (Me.1992)), *vacated on other grounds,* —— U.S. ——, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

When, as here, there is no direct evidence of discrimination, the burden shifting rules established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are applied. *See Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511 (1st Cir.1996). Plaintiff bears the initial burden of establishing a prima facie case of disability discrimination by proving that: (1) he has a disability within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; (3) he was discharged or adversely affected in the terms

and conditions of his employment, in whole or in part, because of his disability. *See id.*

Once Plaintiff establishes a prima facie case, "the burden of production shifts to the defendant but requires, only, that the defendant articulate a legitimate, nondiscriminatory reason for its action." *Hodgens v. General Dynamics Corp.,* 963 F.Supp. 102, 106 (D.R.I.1997) (citing *McDonnell Douglas,* 411 U.S. at 802–06, 93 S.Ct. 1817), *aff'd on other grounds,* 144 F.3d 151 (1st Cir.1998). If the defendant does so, "the plaintiff must prove that the proffered reason is merely a pretext for disability discrimination." *Id.* The First Circuit has adopted the "pretext plus" approach to discrimination claims, requiring the plaintiff to "muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." *Dichner v. Liberty Travel,* 141 F.3d 24, 30 (1st Cir.1998). Thus, the plaintiff must show (1) that the employer's articulated justification for the adverse employment action is false, and (2) that the employer's true motive was discriminatory. *See Champagne v. Servistar Corp.,* 138 F.3d 7, 13 (1st Cir. 1998); *Garcia Ayala v. Bristol Myers– Squibb Mfg. Co.,* 992 F.Supp. 106, 107 (D.P.R.1997); *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 601 (D.Me.1994).

Plaintiff has alleged a prima facie case of disability discrimination under the ADA. Plaintiff alleges that he has a hearing impairment which constitutes a "disability," that he was capable of performing the essential functions of his job with reasonable accommodation, and that he experienced less favorable working conditions than his non-disabled peers because he had no fan and the loudspeaker was not moved. Specifically, Plaintiff asserts that Defendant's failure to accommodate his hearing impairment created less favorable working conditions by interfering with his ability to communicate with his co-workers.[7]

7. To the extent Plaintiff argues that Defendant discharged him because of his disability, the Court finds this claim to be without merit. Plaintiff appears to assert that by failing to accommodate his hearing impairment, Defendant in effect contributed to the very "communication" problem which Defendant cites as the legitimate basis of Plaintiff's termination. This argument misconstrues Defendant's position. Defendant does not assert that Plaintiff's defi-

■ Defendant claims that Plaintiff never requested that he be given a fan or that the loudspeaker be moved. At this stage, the Court is obligated to resolve this factual dispute in Plaintiff's favor, *see McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995), and the Court will therefore assume, for purposes of Summary Judgment, that Plaintiff made the two requests. Even assuming Plaintiff's version of these events to be true, Plaintiff's claim fails because he does not provide the evidence of animus required at the second stage of ADA "pretext-plus" analysis. *See Dichner*, 141 F.3d at 30. To the contrary, Defendant asserts, and Plaintiff does not dispute, that it attempted to accommodate Plaintiff's condition by instructing Plaintiff's team members to position themselves in a manner sensitive to his hearing impairment. Thus, even if a reasonable fact-finder were to conclude that Plaintiff indeed did ask Defendant for the two accommodations specified, Defendant's undisputed attempt to respond to Plaintiff's circumstance, coupled with Plaintiff's failure to present any evidence of hostility by Defendant toward his disability, belie the allegation that Defendant harbored discriminatory animus toward Plaintiff's hearing impairment. Consequently, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's ADA and MHRA disability discrimination claims.

### 2. Rehabilitation Act

■ The Rehabilitation Act prohibits government agencies, federal contractors, and recipients of federal aid from discriminating against disabled individuals. *See* 29 U.S.C. §§ 794, 794(a). Defendant is not a covered entity under the Rehabilitation Act, and the Court therefore grants Defendant's Motion for Summary Judgment on Plaintiff's Rehabilitation Act claim.

### B. Retaliatory Discharge

Plaintiff alleges that he was discharged in violation of MHRA § 4572(1)(A) for exercising his rights under the MWPA.

■ The analytical framework used in Title VII retaliation claims applies to MHRA retaliation claims. *See Nakai v. Wickes Lumber Co.*, 906 F.Supp. 698, 703 n. 5 (D.Me. 1995). Where there is no direct evidence of the defendant's retaliatory animus, courts rely on the *McDonnell Douglas* burden-shifting framework to allocate and order the parties' evidentiary burdens. *See Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996); *Mesnick v. General Electric Co.*, 950 F.2d 816, 827 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). To establish a prima facie case of retaliation, the plaintiff must show that: (1) he engaged in conduct protected by the MWPA; (2) he suffered adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action. *See Fennell*, 83 F.3d at 535; *Hoeppner v. Crotched Mountain Rehabilitation Ctr.*, 31 F.3d 9, 14 (1st Cir.1994).

Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision. *See Fennell*, 83 F.3d at 535. If the defendant does so, the ultimate burden falls on the plaintiff to demonstrate both that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus. *See id.*

■ Plaintiff has satisfied two prongs of the prima facie test for retaliatory discharge: he engaged in protected conduct and he was subject to adverse employment action. Section 833(1) of the MWPA prohibits an employer from terminating an employee because:

A. The employee, acting in good faith ... reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of

---

cient communication skills related to an inability to hear his colleagues. To the contrary, Defendant documentation of incidents on May 10, 1995, November 28, 1995, and January 4, 1996 (the day of Plaintiff's discharge) reflects its as-

sertion that Plaintiff's "communication" problems stemmed, not from a failure to hear his co-workers, but from his argumentativeness and other affirmative verbal conduct.

this State, a political subdivision of this State or the United States.

B. The employee, acting in good faith ... reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual.

Many of Plaintiff's alleged complaints relate to potentially illegal or unsafe conditions and therefore may constitute protected conduct under these subsections of the MWPA cited above. Furthermore, Plaintiff was subject to adverse employment action in the form of discharge. Despite Plaintiff's satisfaction of these two elements, however, Plaintiff's retaliatory discharge claim fails because he did not demonstrate a causal connection between his complaints and his discharge. In addition, he offered insufficient evidence that Defendant's articulated reason for his discharge (Plaintiff's continued insubordination) was false and that Defendant was motivated by retaliatory animus.

There are several ways in which a plaintiff may demonstrate a causal connection between protected conduct and adverse action. An allegation that an employee was discharged soon after making a complaint may support an inference of causal connection. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir.1998); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir.1988); *Nelson v. University of Maine Sys.*, 923 F.Supp. 275, 285 (D.Me. 1996). In the alternative, a plaintiff might produce evidence that otherwise similarly situated individuals did not suffer the same adverse action. *See Ligenza v. Genesis Health Ventures of Mass.*, 995 F.Supp. 226, 232 (D.Ma.1998). Here, a reasonable factfinder could not infer that Plaintiff's discharge came on the heels of his complaint because Plaintiff has not identified in the record the dates of his alleged complaints, or even asserted the general time frame of his communications with Defendant. Moreover, Plaintiff has not alleged that other similarly situated employees were treated differently than him. In sum, Plaintiff has adduced no evidence to support the contention that his complaints were causally linked to his discharge.

■ Furthermore, even assuming that Plaintiff had stated a prima facie case of retaliatory discharge, Plaintiff has not offered evidence sufficient to call into question Defendant's explanation for his discharge, and has offered no evidence of retaliatory animus. Plaintiff merely denies that he refused to communicate with a team member on the day of his discharge and cites the positive performance review dated three months prior to his discharge as evidence of pretext. This same performance review, however, identifies "communication" as a skill Plaintiff needed to improve. Given Plaintiff's failure to present credible evidence of causal connection or pretext and his failure to present any evidence of animus, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's MHRA retaliatory discharge claim.

## C. Hostile Work Environment . Sexual Harassment

Plaintiff alleges that he was subjected to hostile work environment sexual harassment in violation of Title VII and the MHRA. In order to make out a prima facie case of hostile work environment sexual harassment, Plaintiff must establish: (1) that he was a member of a protected class; (2) that he was subject to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of Plaintiff's employment and create an abusive working environment; and (5) that some basis for the employer's liability has been demonstrated. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ Plaintiff offers two versions of the traditional hostile work environment claim, both of which fail under current law. First, Plaintiff claims that he suffered actionable hostile work environment harassment based on sexual orientation. Neither Title VII nor the MHRA recognizes a cause of action for any type of discrimination based on sexual orientation. *See Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th

Cir.1989) ("Title VII does not prohibit discrimination against homosexuals."), *cert. denied.,* 493 U.S. 1089, 110 S.Ct. 1158, 107 L.Ed.2d 1061 (1990); *DeSantis v. Pacific Tel. & Tel. Co.,* 608 F.2d 327, 329–30 (9th Cir. 1979) (Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender and should not be judicially extended to include sexual preference such as homosexuality); 42 U.S.C. § 2000e–2; 5 M.R.S.A. § 4572. As a result, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's sexual orientation discrimination claim.

■ Second, Plaintiff invites the Court to interpret his hostile work environment claim as one based on sex, as opposed to sexual orientation. Indeed, Title VII prohibits discrimination against both women and men "because of ... sex." *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). This prohibition now incorporates a cause of action for same-sex sexual harassment (that is, harassment of a male by another male or harassment of a female by another female), regardless of the harasser's or the victim's sexual orientation. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, —–—–, 118 S.Ct. 998, 1001–02, 140 L.Ed.2d 201 (1998).

Prior to the Supreme Court's decision in *Oncale,* the circuits were split widely on the issue of same-sex sexual harassment. The Fifth Circuit held that same-sex sexual harassment claims are never actionable under Title VII, *see Oncale v. Sundowner Offshore Services, Inc.,* 83 F.3d 118 (5th Cir. 1996); *Garcia v. Elf Atochem North America,* 28 F.3d 446 (5th Cir.1994); the Fourth Circuit recognized such a cause of action under Title VII only where a plaintiff proved that the harasser was homosexual and therefore presumably motivated by sexual desire, *see Wrightson v. Pizza Hut of America, Inc.,* 99 F.3d 138 (4th Cir.1996); and the Seventh and Eighth Circuits permitted Title VII same-sex sexual harassment claims where the plaintiffs could show harassment because of "sex," regardless of the sexual orientation of the parties, *see Doe v. City of Belleville,* 119 F.3d 563 (7th Cir.1997), *vacated,* — U.S.

—, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998); *Quick v. Donaldson Co. Inc.,* 90 F.3d 1372 (8th Cir.1996).

In *Oncale,* the Court explained that Title VII prohibits "sexual harassment *of any kind that meets the statutory requirements.*" *Oncale,* 523 U.S. at —, 118 S.Ct. at 1002 (emphasis added). The Court stressed that its ruling would not "transform Title VII into a general civility code for the American workplace" because a plaintiff alleging same-sex sexual harassment will still have to allege "discriminat[ion] ... because of ... sex." *Oncale,* 523 U.S. at —, 118 S.Ct. at 1002. The Court did not define the contours of discrimination "because of ... sex," though it offered several suggestions. According to the Court, workplace harassment will not automatically constitute sexual harassment under Title VII where the alleged statements merely involve sexual content or connotations. *See id.* Thus, in this case, Plaintiff cannot merely rely on the sexually explicit nature of his co-workers' conduct to support his claim of sexual harassment. Rather, the key issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citing *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). In explaining that an inference of discrimination "because of ... sex" might arise in scenarios beyond those implicating sexual desire on the part of the harasser, the Court offered the following examples:

A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual conno-

tations, but actually constituted "discrimina[tion] . . . because of . . . sex."

*Id.*

Courts are only beginning to decipher the "because of . . . sex" requirement emphasized in *Oncale.*[8] Here, Plaintiff does not offer any of the sex-based evidence suggested by the Court in that case. Rather, at oral argument, Plaintiff invited the Court to interpret the "because of . . . sex" requirement as, in effect, a "because of gender" requirement. The two terms do appear distinguishable: while "sex" tends to refer to an individual's physical characteristics and is considered immutable, 'gender' is a broader concept which encompasses personality features and socio-sexual roles typically associated with "masculinity" or "femininity." *See generally* Deborah Zalesne, *When Men Harass Men: Is it Sexual Harassment?*, 7

Temp.Pol. & Civ.Rts.L.Rev. 395, 403 (1998). Under a "gender" approach, discrimination "because of . . . sex" is equivalent to discrimination based on gender related conduct—a male targeted for harassment because of perceived effeminate behavior, for example, might have a Title VII same-sex sexual harassment claim. *See* Erwin Chemerinsky, *Defining Sexual Harassment,* Trial, May 1998, at 86, 87–88.

In this case, even under a "gender" approach,[9] Plaintiff failed to allege facts supporting an inference that the harassment was based on his gender. The only facts on the record conceivably relating to Plaintiff's gender are his undisputed allegations that he is a homosexual and that he was perceived as such by co-workers. Given that these are the only gender-related facts before the

8. Only a few courts have confronted Title VII same-sex sexual harassment claims since *Oncale* was decided. *See, e.g., Romero v. Caribbean Restaurants, Inc.,* 14 F.Supp.2d 185, 187 (D.P.R. 1998) (rejecting Title VII same-sex hostile work environment sexual harassment claim where harasser subjected both male and female employees to lewd behavior); *Raum v. Laidlaw, Ltd.,* No. 97–CV–111 (FJS), 1998 WL 357325 (N.D.N.Y. July 1, 1998) (dismissing Title VII same-sex hostile work environment sexual harassment claim where plaintiff failed to allege "discrimination . . . because of sex" and alleged harasser merely "engaged in conduct that some people of either gender may consider to be rude or vulgar behavior"); *Bacon v. Art Institute of Chicago,* 6 F.Supp.2d 762 (N.D.Ill.1998) (finding genuine issue of material fact as to whether plaintiff was harassed "because of" his sex where harasser photographed plaintiff's buttocks and displayed photograph, continually touched various parts of plaintiff's body, and simulated sexual acts on plaintiff's body).

9. A recent Supreme Court development may limit the viability of even a gender-based, as opposed to sex-based, approach to same-sex sexual harassment. Five days after issuing its decision in *Oncale,* the Court vacated, without opinion, the judgment of the Seventh Circuit in *Doe v. City of Belleville,* 119 F.3d 563 (7th Cir.1997) *"in light of Oncale"* (emphasis added). *City of Belleview v. Doe,* —— U.S. ——, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998).

In *Belleville,* one of the two plaintiffs, a heterosexual adolescent who wore an earring, alleged that his male co-workers referred to him as the "fag" or the "queer." *Belleville,* 119 F.3d at 566. He further alleged that one male co-worker told him to "go back to San Francisco with the rest of the queers," asked him if he was "a boy or a

girl," called him his "bitch," and threatened to take him "out to the woods" and "get [him] up the ass." *Id.* at 567. The harassment alleged also had a physical component: the plaintiff asserted that this same co-worker ultimately grabbed him by the testicles in a proclaimed effort to "finally find out if you are a girl or a guy." *Id.* at 567.

The Seventh Circuit reversed the district court's grant of summary judgment in favor of the defendant on the plaintiff's Title VII sexual harassment claim, holding that the harassers' apparent belief that the plaintiff's wearing of an earring did not conform to male standards supported an inference that the plaintiff was harassed "because of" his gender. *See id.* at 574. Throughout its opinion, the Court used the terms "sex" and "gender" interchangeably.

In his concurring and dissenting opinion, Judge Manion disagreed with the majority's conclusion that the particular behavior alleged constituted actionable harassment under Title VII and adopted a much narrower reading of the "because of . . . sex" requirement. *See id.* at 599–601. Judge Manion instead concluded that the harassment occurred because "H. Doe wore an earring, not because H. was a male," *id.* at 601, and criticized the majority for "shift[ing] the focus from the individual's sex (male or female) to sexuality," given that "Title VII does not prohibit discrimination on the basis of 'sexuality,' 'sexual orientation,' 'something linked to sex,' or anything else—only discrimination . . . because the victim is a man, or because the victim is a woman." *Id.* at 603–04.

The Supreme Court's vacation of the decision in *Belleville* "in light of Oncale" suggests that the Court may favor Judge Manion's stricter reading of the term "sex" over the majority's broader use of the term "gender."

Court, Plaintiff effectively asks the Court to equate "gender" with "sexual orientation" under Title VII analysis. In light of Title VII's scope of coverage, which does not include sexual orientation discrimination, the Court declines to do so. In its current form, Title VII does not provide a remedy to persons who have experienced harassment motivated solely by animus toward the plaintiff's sexual orientation.[10] Thus, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's claim of hostile work environment sexual harassment.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment on all Counts of Plaintiff's Complaint is GRANTED.

*SO ORDERED.*

---

**10.** In determining along with numerous other jurisdictions that Title VII does not provide a remedy for discrimination based on sexual orientation, the Court does not in any way condone this serious and pervasive activity in the American workplace. The intolerable working conditions set forth in the cases denying relief under Title VII for rampant discrimination based on sexual orientation call for immediate remedial response by Congress. *See e.g., Shermer v. Illinois Dep't of Transp.,* 937 F.Supp. 781 (C.D.Ill. 1996) (homosexual plaintiff's supervisor allegedly made frequent sexually offensive remarks about plaintiff's engaging in sexual acts with members of his own sex); *Dillon v. Frank,* 58 Fair Empl. Prac.Cas. (BNA) 90, No. 90–CV–70799–DT, 1990 WL 358586 (E.D.Mich. Oct.19, 1990), *aff'd. in an unpublished op.,* 952 F.2d 403 (6th Cir.1992) (text in Westlaw) (homosexual plaintiff allegedly was "taunted, ostracized, and physically beaten"); *Carreno v. Local Union No. 226, Int'l Bhd. Of Elec. Workers,* Civ. A. No. 89–4083–S, 1990 WL 159199 (D.Kan. Sept.27, 1990) (homosexual plaintiff allegedly was called "faggot" and various female names for years by co-workers).