952 F.2d 403
 58 Fair Empl.Prac.Cas. (BNA) 144,
58 Empl. Prac. Dec. P 41,332, 60 USLW 2471
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ernest DILLON, Plaintiff-Appellant,
v.
Anthony M. FRANK, Postmaster General, Defendant-Appellee.
 No. 90-2290.
 United States Court of Appeals, Sixth Circuit.
 Jan. 15, 1992.
 
 Before BOGGS, Circuit Judge; BAILEY BROWN, Senior Circuit Judge; and GIBBONS, District Judge.*
 BOGGS, Circuit Judge.
 
 
 1
 Ernest Dillon is a middle-aged man and a former employee of the United States Postal Service. This case concerns his departure from that employment. During his tenure, Dillon was taunted, ostracized, and physically beaten by his co-workers because of their belief that he was a homosexual. Dillon contends that he left the employ of the Postal Service because of the cruel treatment he received from his co-workers. He asks the federal courts to redress that cruelty under the authority provided to us by Title VII of the 1964 Civil Rights Act and the Federal Tort Claims Act. While we sympathize with his plight, we are constrained to hold that he has not stated a cause of action under Title VII and that his FTCA claim was procedurally defective. We therefore affirm the district court's dismissal of his claims.
 
 
 2
 * Dillon worked as a mail handler at the Bulk Mail Center at Allen Park, Michigan. He started work in 1980, but his difficulties did not begin until late 1984.[1] A fellow employee, Kenneth Barrett, began calling Dillon "fag," and saying that "Dillon sucks dicks." Barrett also pushed materials into Dillon's work area, and turned off the bathroom lights when Dillon entered. This continued for five months, culminating in a physical assault by Barrett on Dillon in which Dillon suffered numerous injuries. The Postal Service fired Barrett as a result.
 
 
 3
 This did not end Dillon's travails. What had begun as a one-man band expanded into a full orchestral assault of verbal abuse. Other employees used similar epithets. Graffiti, the last refuge of the courageous, appeared on conveyor belts and Dillon's loading trucks informing the mail center that "Dillon sucks dicks" and "Dillon gives head." Dillon endured these circumstances for three years before he finally resigned in 1988 upon advice from his psychiatrist.
 
 
 4
 The Bulk Mail Center's management was well aware of these events. Dillon complained to eight different supervisors, and two union representatives. Management allegedly did nothing more than admonish the harassers, and hold meetings detailing the policy against sexual harassment in place at the center. Dillon alleges that management finally threw up their hands in despair, telling Dillon not to waste their time with his complaints and to fight back when taunted.
 
 
 5
 Dillon's pro se complaint states that he filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC"), and the defendant's answer admits this allegation. There is no documentation of any dealings between Dillon and the EEOC in the record, nor did Dillon include any details of his dealings with the EEOC in his pleadings. Dillon does not include, for example, the date of his initial filing with the EEOC, the form detailing the substance of the complaint that he allegedly brought before the EEOC, or any "Right To Sue" letter he may have received from the EEOC. Nevertheless, Dillon states in his brief that the administrative law judge initially hearing his EEOC case ruled in his favor, finding that Dillon had proved he was sexually harassed and that the Postal Service both knew about the harassment and failed to take effective steps to counteract it. Dillon alleges that this ruling was rejected by the Postal Service, and that the EEOC Office of Review and Appeals agreed with the Service, holding that "Title VII's prohibition of sexual harassment ... does not apply to sexual orientation."
 
 
 6
 Dillon then sued in federal court, alleging sexual harassment under Title VII and the tort of intentional infliction of emotional distress under Michigan law, made applicable to a federal agency by the Federal Tort Claims Act ("FTCA"). Defendant filed a motion urging dismissal under Rules 12(b)(1) and (b)(6), FED.R.CIV.P. The Title VII claim was attacked only for failure to state a claim under 12(b)(6). The district court agreed with defendant. The court dismissed the Title VII claim on two independent grounds, one jurisdictional and the other substantive. The court held, on its own motion, that Dillon had failed to establish that the court had jurisdiction under Title VII, as he had failed to plead that he had exhausted his EEOC remedies by timely filing a charge with the EEOC. The court also noted that Dillon had failed to plead that he had received a "Right To Sue" letter from the EEOC, a prerequisite to jurisdiction under Title VII. Substantively, the court found that Title VII does not prohibit discrimination based on sexual preference or orientation. The court dismissed the FTCA claim on purely procedural grounds. The court found that Dillon had not alleged that he had submitted a claim demanding a sum certain to the Postal Service prior to filing suit, as required by the FTCA. The court also found that Dillon had sued an improper party defendant, as the FTCA only permits suits against the United States, not individual federal agencies. Dillon's timely appeal followed.
 
 II
 
 7
 We turn first to the jurisdictional issue. We note that we have been able to find no cases that require a specific pleading of jurisdictional facts in the complaint when the necessary facts actually exist. Dillon filed his complaint pro se. In it, he stated a proper general basis for the district court's jurisdiction, the federal question jurisdiction of 28 U.S.C. § 1331. He also stated in the complaint that he had filed a complaint with the EEOC, but did not specifically allege that this claim was filed in a timely fashion, nor that he had received a "Right to Sue" letter and initiated this case in a timely manner following the receipt of that letter.
 
 
 8
 Had the defendant challenged subject matter jurisdiction of the Title VII action by a motion under Rule 12(b)(1), there is no doubt that plaintiff would have been required to prove any contested jurisdictional facts. See Rogers v. Stratton Indus., 798 F.2d 913 (6th Cir.1986). However, defendant made no such motion, and thus plaintiff had no notice that he might have to defend jurisdiction over the Title VII complaint.
 
 
 9
 Rather, the district court, completely on its own motion, stated that it lacked subject matter jurisdiction of the Title VII claim, though it also dismissed that part of the complaint for failure to state a claim. This was the first time that defendant, who had now obtained a lawyer, had any indication that there might be a jurisdictional problem.
 
 
 10
 While it certainly would have been better tactically for plaintiff to have filed a motion for reconsideration containing whatever proof of the jurisdictional facts plaintiff may have, such an action is not required for us to consider the propriety of the judge's action.
 
 
 11
 In defense of the judge's action, the appellee in his brief has not argued that a plaintiff is required to place in his pleadings all of the necessary jurisdictional facts. Rather, he correctly asserts that "one of the mandatory prerequisites to filing a civil action under Title VII is the timely exhaustion of administrative remedies." However, the brief does not even contend that plaintiff did not in fact properly and timely exhaust his administrative remedies. It cites Moir v. Greater Cleveland Regional Transit Auth., 895 F.2d 266, 269 (6th Cir.1990), for the proposition that the court does not have jurisdiction "[w]ithout [a] showing by plaintiff that he complied with the administrative prerequisites to suit." However, Moir does not support that proposition. It simply states that "[w]here subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." (Emphasis added). Thus, this case is not authority either for the necessity of pleading jurisdictional facts, nor is it authority for a court dismissing an action sua sponte and without notice where such facts have not been pled.
 
 
 12
 In a Third Circuit case, Gooding v. Warner-Lambert Co., 744 F.2d 354 (3d Cir.1984), the court reversed a similar dismissal even where the facts giving subject matter jurisdiction may not have existed at the time of the filing of the complaint, where they in fact existed at a later time. The court held that even when a specific motion to dismiss was filed, leave to amend should have been granted even if the motion was correct. Id. at 359.
 
 
 13
 Dismissal of a case on the court's own motion is rare, and generally disfavored. Murphy v. Lane, 833 F.2d 106 (7th Cir.1987). Cases permitting such dismissals almost invariably involve either patently frivolous lawsuits, see Baker v. Director, U.S. Parole Comm'n, 916 F.2d 725 (D.C.Cir.1990); Crowley Cutlery Co. v. United States, 849 F.2d 273 (7th Cir.1988), or for want of prosecution, see, e.g., Daniels v. Brennan, 887 F.2d 783 (7th Cir.1989). See also Boudwin v. Graystone Ins. Co., 756 F.2d 399 (5th Cir.1985). However, with the exception of the Third Circuit case cited previously, we are unable to find any reported cases of litigation involving the type of sua sponte dismissal for lack of subject matter jurisdiction that is present here. A number of courts have specifically held that a court may not sua sponte dismiss a case for lack of personal jurisdiction. Kapar v. Kuwait Airways Corp., 845 F.2d 1100 (D.C.Cir.1988); Lipofsky v. New York State Workers Compensation Bd., 861 F.2d 1257 (11th Cir.1988); Pilgrim Badge & Label Corp. v. Barrios, 857 F.2d 1 (1st Cir.1988); see also Ingvoldstad by Meyer v. Kings Wharf Island Enter., Inc., 593 F.Supp. 997 (D.V.I.1984), aff'd, 770 F.2d 1071 (2d Cir.1985), referring to power to determine whether conditions essential to jurisdiction exist.
 
 
 14
 The general rule where the court perceives a defect, short of complete and obvious should be that noted in Baron v. United States Steel Corp., 649 F.Supp. 537 (N.D.Ind.1986), that a court should provide notice and an opportunity to respond before such sua sponte dismissal.
 
 
 15
 Under these circumstances, if the case were viable on the merits, we would have no choice but to remand the case to the district court for a factual finding on the jurisdictional points that have now been put at issue. However, in light of our ruling on the merits, such a remand would be superfluous, and we proceed now to a consideration of the appropriateness of the summary judgment on the merits.
 
 III
 
 16
 * This is a case of statutory interpretation. Title VII makes it illegal "to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The Supreme Court has held that an employer who creates a hostile working environment for members of a class protected by Title VII, such as blacks or women, is discriminating "with respect to ... terms [and] conditions" of employment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986). The question Dillon poses for us is whether such a hostile working environment involving sexual epithets and directed at a person because of perceived sexual behavior (homosexuality) is also proscribed by Title VII. In effect, Dillon asks us to define "because of sex" to mean "because of anything relating to being male or female,[2] sexual roles, or to sexual behavior." Because we believe that only discrimination based on being male or female is prohibited by Title VII, and that the cases proscribing hostile environment sexual harassment are not to the contrary, we affirm the district court.
 
 B
 
 17
 This would be an easy case if Dillon alleged that he was discriminated against because he was believed to be a homosexual. The circuits are unanimous in holding that Title VII does not proscribe discrimination based on sexual activities or orientation. Williamson v. A.G. Edwards and Sons, Inc., 876 F.2d 69 (8th Cir.1989), cert. denied, 493 U.S. 1089 (1990); DeCintio v. Westchester County Medical Ctr., 807 F.2d 304 (2d Cir.1986), cert. denied, 484 U.S. 825 (1987); DeSantis v. Pacific Tel. & Tel. Co., 608 F.2d 327 (9th Cir.1979); Smith v. Liberty Mut. Ins. Co., 569 F.2d 325 (5th Cir.1978). "It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary common meaning.... The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men." Ulane v. Eastern Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir.1984), cert. denied, 471 U.S. 1017 (1985). That such a "traditional" interpretation of the word "sex" was intended by Congress can be seen by the context in which it was placed, along with either immutable characteristics (race, color, national origin) and a characteristic so deeply rooted for most that it is almost immutable (religion). See DeCintio, 807 F.2d at 306-07. We have previously expressed our agreement with these courts in dicta in an unpublished opinion. See Ruth v. Children's Medical Ctr., No. 90-4069, 1991 WL 151158, * 5 (6th Cir. Aug. 8, 1991). We do not disagree with the reasoning of those courts, especially as there is no indication that Congress intended to do anything more than prohibit discrimination against a person because that person is male or female. See Vinson, 477 U.S. at 63-64.
 
 
 18
 This is not an easy case because Dillon does not allege that he is entitled to Title VII protection simply because he is alleged to be a homosexual. Rather, Dillon alleges that he was the victim of sexual harassment that was so pervasive that it rises to the level of a hostile work environment. He analogizes his circumstances to those under which it is clear plaintiffs can recover under Title VII. He directs us to cases where women who were subjected to demeaning and cruel verbal abuse (unaccompanied by demands for sexual favors) were able to secure a remedy through Title VII. Wall v. AT & T Technologies, Inc., 754 F.Supp. 1084 (M.D.N.C.1990); Bennett v. New York City Dep't of Corrections, 705 F.Supp. 979 (S.D.N.Y.1989); Porta v. Rollins Envtl. Serv. (NJ), Inc., 654 F.Supp. 1275 (D.N.J.1987), aff'd, 845 F.2d 1014 (3d Cir.1988); Zabkowicz v. West Bend Co., 589 F.Supp. 780 (E.D.Wis.1984). He further points to cases where plaintiffs subjected to demands by a boss for homosexual intercourse have been permitted to bring an action under Title VII. Parrish v. Washington Nat'l Ins. Co., No. 89-C-4515, 1990 U.S.Dist.LEXIS 13934 (N.D.Ill. Oct. 19, 1990); Joyner v. AAA Cooper Transp., 597 F.Supp. 537 (M.D.Ala.1983), aff'd 749 F.2d 732 (11th Cir.1984); Wright v. Methodist Youth Serv., Inc., 511 F.Supp. 307 (N.D.Ill.1981). These cases, he contends, hold that all extremely unpleasant working environments that arise because of verbal and other abuse regarding sex are proscribed, and that therefore the fact that the harassment in his case was predicated upon a belief that he is a homosexual, rather than specifically on his being male, is irrelevant. He contends that he was subjected to this abuse relating to homosexuality solely because he was a man, and therefore has stated a claim under Title VII.
 
 
 19
 Dillon also advanced a separate contention at oral argument. He pointed to the Supreme Court's decision in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), which considered a claim that a female plaintiff had been denied partnership at a prestigious accounting firm in part because she was not considered feminine enough. Dillon notes that the Court stated that evidence of such sex stereotyping[3] is admissible to prove sex discrimination. Price Waterhouse, 490 U.S. at 250-52. He contended that he was subjected to such stereotyping in that he was not deemed "macho" enough by his co-workers for a man, and that the verbal abuse resulted from this stereotyping.
 
 
 20
 It is clear that claims that the work environment was made hostile by animus against a person because that person was a man or a woman, even if the person was not subjected to demands for sexual favors, are cognizable under Title VII. Vinson, 477 U.S. at 64-67. The reason is simple: requiring a person to submit to abuse based on the fact that the person is male or female introduces sex as a factor in the workplace. Vinson, 477 U.S. at 67. It does so by forcing some persons, solely because they are male or female, to endure hostile working conditions, while permitting the other group to enjoy their workplace. Thus, a "condition" of employment includes whether the workplace is free from ridicule and other devices that stigmatize the recipient as inferior, and the refusal to provide that workplace because a person is male or female violates Title VII.
 
 
 21
 An employer may be held liable on a hostile environment claim if five criteria are met. These are (1) the plaintiff must be a member of a protected class, and (2) be subjected to unwelcomed verbal or physical conduct of a sexual nature; (3) the harassment complained of must be based on sex; (4) the harassment alleged "had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psycho logical [sic] well-being of the plaintiff"; and (5) there must be respondent superior liability. Rabidue v. Osceola Ref. Co., 805 F.2d 611, 619-20 (6th Cir.1986), cert. denied, 481 U.S. 1041 (1987); Highlander v. K.F.C. Nat'l Management Co., 805 F.2d 644, 649 (6th Cir.1986). See Wheeler v. Southland Corp., 875 F.2d 1246, 1249 n. 3 (6th Cir.1989). These five factors are adhered to by the other circuits. See, e.g., Hall v. Gus Constr. Co., 842 F.2d 1010, 1013 (8th Cir.1988); Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir.1982); Robinson v. Jacksonville Shipyards, Inc., 760 F.Supp. 1486, 1522 (M.D.Fla.1991). The harassment complained of must be severe and pervasive, and that is determined from the totality of the circumstances. Carrero v. New York City Hous. Auth. 890 F.2d 569, 577 (2d Cir.1989); Lipsett v. University of P.R., 864 F.2d 881, 897-98 (1st Cir.1988); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir.1987); Scott v. Sears, Roebuck & Co., 798 F.2d 210 (7th Cir.1986).
 
 
 22
 Dillon's analogy is appealing because of the cruel treatment he was subjected to, and its similarity to the facts of many cases involving heterosexual hostile environment claims. The harassment that he was subjected to was clearly sexual in nature. It seriously affected Dillon's psychological well-being, to the point that Dillon felt compelled to resign. The Postal Service knew about the harassment, and yet it continued unabated, raising the strong possibility that there would be employer liability for the actions of Dillon's co-workers. It appears undeniable that Dillon was denied the "condition" of employment at issue in hostile environment cases, a workplace where each employee is treated with appropriate dignity and respect.
 
 
 23
 We have searched for cases involving the type of claim Dillon makes here. We have found only one unreported district court case that made a square holding on Dillon's type of argument. Carreno v. Local Union No. 226, Int'l Bhd. of Elec. Workers, No. 89-4083-S, 1990 U.S.Dist. LEXIS 13817 (D.Kan. Sept. 27, 1990). But see Fair v. Guiding Eyes for the Blind, Inc., 742 F.Supp. 151, 156 (S.D.N.Y.1990) (contains dicta that "[c]omments of a homosexual nature directed at a man ... might be considered to be based on sex."). Carreno involved a man who divorced his wife and started to live with a man in a homosexual relationship. For this, plaintiff was subjected to verbal abuse, such as being called "Mary" and "faggot." Carreno, 1990 U.S.Dist.LEXIS at * 3-4. The court ruled that the plaintiff was arguing that he was harassed because he was a homosexual, and that therefore the rulings in DeSantis and Williamson holding that discrimination based on sexual preference or orientation is not discrimination "based on sex" within the meaning of Title VII compelled summary judgment for the defendants. Id. at * 8-9.
 
 
 24
 Despite the compelling facts of Dillon's situation, we agree with the result in Carreno. Although the cases recognizing claims for hostile environment sexual harassment hold that employees have a right to a work environment free from denigrating comments, verbal abuse, and other tactics of marginalization, see Vinson, 477 U.S. at 65, that body of law does not hold that right to be absolute. Rather, Title VII only punishes those employers who withhold such environments from employees based on certain proscribed criteria: race, color, sex, religion, or national origin.
 
 
 25
 We can see this when we examine the leading cases in this line. The Supreme Court in Vinson analogized claims of hostile sexual environment to those of hostile racial environment, holding that "[n]othing in Title VII suggests that a hostile environment based on discriminatory sexual harassment should not be likewise prohibited." Vinson, 477 U.S. at 66. (emphasis in original). This is followed immediately by the statement that Title VII is violated by a hostile environment created by "discrimination based on sex." Ibid. (emphasis added). In making this analogy, the Court cannot be understood to have been doing anything more than establishing that hostile environments created because of statutorily impermissible motives are cognizable under Title VII.
 
 
 26
 The leading circuit cases on hostile environment sexual harassment are in accord. The Eleventh Circuit in Henson stated, in evaluating the third prima facie case criteria that the harassment be "based on sex," that "[t]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion.... In proving a claim for hostile work environment due to sexual harassment, therefore, the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment." Henson, 682 F.2d at 903-04. (Emphasis added). Accord Lipsett, 864 F.2d at 897 (hostile environment harassment occurs when there is "an atmosphere so infused with hostility toward members of one sex" that the conditions of employment are altered for those persons) (emphasis added); Andrews v. City of Philadelphia, 895 F.2d 1469, 1483 (3d Cir.1990) ("Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women.") (emphasis added). See Robinson, 760 F.Supp. at 1522-23 (collecting cases holding that the harassment must be directed at the plaintiff because plaintiff is female). In none of these cases is the content of the harassment the deciding factor in determining if Title VII provides a remedy; it is whether the harassment was directed at the plaintiff for a statutorily impermissible reason.
 
 
 27
 Thus, Dillon cannot escape our holding, and those of the other circuits, that homosexuality is not an impermissible criteria on which to discriminate with regard to terms and conditions of employment. Dillon's co-workers deprived him of a proper work environment because they believed him to be homosexual. Their comments, graffiti, and assaults were all directed at demeaning him solely because they disapproved vehemently of his alleged homosexuality. These actions, although cruel, are not made illegal by Title VII.
 
 
 28
 In a perfect world, the "right" to dignified treatment by one's employer and co-workers would be absolute: all workers of the world would unite in being "nice" toward one another. In our less than perfect world, both criminal and tort law may provide workers with protection against cruel harassment by their co-workers. Indeed, some of the actions Dillon complains of seem capable of remedy under both tort and criminal law, such as Barrett's beating (battery) and his co-workers taunting and graffiti-writing (intentional infliction of emotional distress). If Dillon can prove that the harassment ever caused him to be immediately apprehensive of another physical assault--and given the increase of the harassment after his recovery from Barrett's beating, this is not at all implausible--he can also sue for assault. See RICHARD EPSTEIN, CHARLES GREGORY, AND HARRY KALVEN, TORTS, 1010-16 (4th ed. 1984). In fact, to the extent that his co-workers and employer wanted to see Dillon quit, he could even sue for tortious interference with contract or employment relationship. The base result, however, is undisturbed; our decision today does not leave those in Dillon's situation without legal remedy.
 
 
 29
 We interpret Title VII to prescribe only specified discriminatory actions. What Title VII proscribes, although vitally important, is easily exceeded by what it does not. Employers or co-workers can still make the workplace unpleasant based on political belief ("damned Republican"), see Reichman v. Bureau of Affirmative Action, 536 F.Supp. 1149, 1176 (M.D.Pa.1982) ("comments concerning the Arab-Israeli conflict and Menachem Begin were political opinions rather than disparagements of Judaism"); a co-worker's discussing sexual topics at work, see Fair, 742 F.Supp. at 155 ("petty, inappropriate remarks made by someone conducting himself in an improper and unprofessional manner" not sexual harassment); family antagonism ("damned Rockefeller"); college attended ("i'm a Harvardian, you Yalie"); eating practices ("how can you eat something that used to be alive"); or rooting for particular sports teams ("the Dodgers are bums").
 
 
 30
 Work environments can be made extremely unpleasant based upon disagreement over beliefs closely related to factors protected by Title VII. Persons who hold beliefs or support practices repugnant to most in our society, such as the Indian practice of widow-burning known as "suttee," or a belief in "racial purity" based on Norse mythology, do not receive Title VII protection.[4]
 
 
 31
 Among the most serious harassment suffered in the employment context may be that faced by strike-breakers from union members. Epithets such as "scab" are routine. The depth of the feelings attached to that epithet were best expressed in what the Supreme Court called "a well-known piece of trade union literature" entitled "The Scab," the authorship of which is ascribed to Jack London. Some excerpts from that pamphlet:
 
 
 32
 After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which he made a scab.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 Where others have hearts, he carries a tumor of rotten principles.
 
 
 36
 When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 Judas was a gentleman compared with a scab. For betraying his Master, he had enough character to hang himself. A scab has not.
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 [A] SCAB is a traitor to his God, his country, his family and his class.
 
 
 43
 Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 268 (1974). (Emphasis supplied by Supreme Court).
 
 
 44
 Harassing phone calls and physical assaults have been known to have been visited upon "scabs." The pain that can be caused by such harassment is very real, like Dillon's; like Dillon's, it is not capable of remedy by Title VII.
 
 
 45
 Dillon attempts to avoid this problem by alleging that he was discriminated against because he was male. His argument is that but for his being male, he would not have been abused. We find this argument unpersuasive, primarily because he has not shown that his co-workers would have treated a similarly situated woman any differently. Dillon's argument must presume that the abuse was either directed at his supposed homosexuality or at specific sexual practices (such as anal sex or fellation). In two of its cases, the District of Columbia Circuit has raised the figure of the bisexual sexual harasser, preying equally on men and women, as a way to demonstrate that Title VII proscribes certain motives behind discrimination, not the practices used to implement those motives. See Bundy v. Jackson, 641 F.2d 934, 942 n. 7 (D.C.Cir.1981); Barnes v. Costle, 561 F.2d 983, 990 n. 55 (D.C.Cir.1977) (legal question to ask in sex harassment cases is whether a condition was imposed "which, but for his or her sex, the employee would not have faced"). Dillon has not shown such unisexual oppression: he has not argued that a lesbian would have been accepted at the Center,[5] nor has he argued that a woman known to engage in the disfavored sexual practices would have escaped abuse. See Porta v. Rollins Envtl. Serv. (NJ), Inc., 654 F.Supp. 1275, 1279 (D.N.J.1987) (graffiti alleging "Judy sucks Bernie's dick" part of sexual harassment claim). Without such a showing, his claim to have been discriminated against because he is male cannot succeed.
 
 C
 
 46
 Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) does not direct a different result. Price Waterhouse was not a hostile environment case. It involved a specific management decision and the plaintiff's allegation "that gender played a part in a particular employment decision." Because of this difference, we do not read the Court to mean that any treatment that could be based on sexual stereotypes would violate Title VII.
 
 
 47
 First, there is no specific evidence of "sex stereotyped remarks" in our case. In Price Waterhouse, the plaintiff's superiors had criticized her aggressiveness, advised her to use makeup, and suggested she go to "charm school." The Court emphasized that in showing "that the employer actually relied on her gender in making its decision.... stereotyped remarks can certainly be evidence that gender played a part." Price Waterhouse, 490 U.S. at 251 (emphasis in original). In our case there is no evidence provided that Dillon's co-workers justified their outrageous behavior based on, or accompanied it with remarks indicating, a belief that his practices would be acceptable in a female but unacceptable in a male.
 
 
 48
 Further, the Court emphasized the "intolerable and impermissible Catch-22" in the stereotyping in that case. Ibid. A desirable trait (aggressiveness) was believed to be peculiar to males. If Hopkins lacked it, she would not be promoted; if she displayed it, it would not be acceptable. In our case, Dillon's supposed activities or characteristics simply had no relevance to the workplace, and did not place him in a "Catch-22."
 
 
 49
 Thus, the discussion of sexual stereotyping in Price Waterhouse does not support a holding that discrimination "on account of sex" was involved in this case.
 
 IV
 
 50
 We also affirm the district court with respect to Dillon's FTCA claim. It is well settled that a suit under the FTCA must first be presented as a claim to the allegedly liable agency in order to permit the agency to settle out of court. Douglas v. United States, 658 F.2d 445 (6th Cir.1981). A claim is held to have been submitted to the agency when what the agency receives contains sufficient facts to enable the agency to investigate the claim, and a "sum certain" is placed on the claim. Douglas, 658 F.2d at 447. Here, Dillon never submitted to the Service an estimate of the money he was seeking for his claim. All Dillon contends that he told the Service is that he would be recovering expense for his psychological injuries without specifying a sum. That is insufficient to permit a FTCA claim to go forward.
 
 
 51
 Dillon's suit would still not state a claim under the FTCA even if he had submitted to the Service a claim with a sum certain. The FTCA permits suits only against the United States, not the Postmaster General or any other affected agency. Woods v. United States, 720 F.2d 1451, 1452 n. 1 (9th Cir.1983), citing United States v. Gilman, 347 U.S. 507, 509 (1954). Thus, Frank is the wrong party defendant.
 
 V
 
 52
 For the foregoing reasons, we AFFIRM the district court's judgment dismissing Dillon's claims.
 
 
 53
 Judges BAILEY BROWN and GIBBONS concur in this opinion only to the extent that they agree that the district judge did not err in granting the defendant's motion to dismiss the complaint in this case.
 
 
 
 *
 The Honorable Julia Smith Gibbons, United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 The language we recite is taken from Dillon's pro se complaint. His brief contends that the complaint's recitation is only a small sample of the abuse directed at Dillon that is contained in the EEOC record. Although the exact language is not essential to the resolution of the case, we include a sample to demonstrate the strength of Dillon's analogy to cases involving heterosexual hostile environment harassment
 
 
 [2]
 Because the very concept and definition of the word "sex" is at issue in this case, I will generally use terms such as "being male or female" to mean the genetic concept of the sex of a human as transmitted by the sex chromosome of the father
 
 
 [3]
 We define "sex stereotyping" to mean the assigning of certain behavioral characteristics as appropriate for women or for men, but not for the other sex. Sex stereotyping is illegal when it is the basis for discriminating against members of a protected class with respect to the terms and conditions of employment
 
 
 [4]
 The problem of belief and protection under Title VII from harassment based upon such beliefs becomes intricate in the case of religions that adhere to practices considered to be oppressive to women. Religious belief, in addition to religious practice, is explicitly protected by Title VII. See 42 U.S.C. § 2000e(j). Can a law firm refuse to make a Mormon male a partner if he believes that polygamy is God's command?
 
 
 [5]
 Such proof might then show that Dillon's co-workers were not discriminating against him solely because he was a homosexual, but because he was a homosexual male