John J. BIBBY, Plaintiff,

v.

THE PHILADELPHIA COCA COLA BOTTLING CO., Defendant.

No. 98–287.

United States District Court, E.D. Pennsylvania.

March 2, 2000.

As Amended March 17, 2000.

**510**

Jonathan J. James, Arthur Jarrett, Philadelphia, PA, for Plaintiff.

Michael Tierce, Philadelphia, PA, Lisa Scidurlo, Philadelphia, PA, for Defendant.

### ORDER & MEMORANDUM

DuBOIS, District Judge.

### ORDER

AND NOW, to wit, this 2nd day of March, 2000, upon consideration of Defendant Philadelphia Coca–Cola Bottling Company's Motion for Summary Judgment (Document No. 46, filed June 24, 1999), the Memorandum of Law on Behalf of Plaintiff, John. J. Bibby, Contra the Motion for Summary Judgment Filed on Behalf of the Defendant, Philadelphia Coca–Cola Bottling Company (Document No. 47, filed July 19, 1999), Defendant's Reply Memorandum to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Document No. 49, filed August 16, 1999), Defendant's Motion for Leave to Supplement Defendant's Motion for Summary Judgment (Document No. 70, filed January 5, 2000), and Plaintiff's Reply to Supplemental Filing for Summary Judgment by Defendant, Philadelphia Coca Cola Bottling Company (Document No. 71, filed January 19, 2000), for the reasons stated in the attached memorandum, **IT IS ORDERED** as follows:

1. Defendant's Motion for Summary Judgment is **GRANTED** as to Count I of the Amended Complaint alleging a violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and **JUDGMENT** is **ENTERED** in favor of Defendant Philadelphia Coca–Cola Bottling Company and against Plaintiff John J. Bibby; and,

2. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Count II of the Amended Complaint alleging a state law claim of intentional infliction of emotional distress, and Count II of the Amended Complaint is **DISMISSED WITHOUT PREJUDICE.**

### MEMORANDUM

Presently before the Court is the motion for summary judgment of Philadelphia Coca–Cola Bottling Company ("Coca–Cola" or "defendant"). In its motion, defendant seeks summary judgment against plaintiff on plaintiff's Title VII same-sex sexual harassment claim (Count I, Amend-

ed Complaint) and plaintiff's state law intentional infliction of emotional distress claim (Count II, Amended Complaint).

## I. BACKGROUND

Based on the evidence currently before the Court, the facts can be summarized as follows:

Plaintiff John Bibby ("plaintiff") began working for defendant in June, 1978, shortly after graduating from high school. Approximately 30 days after beginning his employment with Coca–Cola, plaintiff joined the International Brotherhood of Teamsters, Local 830 ("Local 830"), a union which has a collective bargaining relationship with Coca–Cola. At all times material to the case, the terms of plaintiff's employment were governed by a collective bargaining agreement ("CBA") between Coca–Cola and Local 830.

The first incident of which plaintiff complains in the Amended Complaint occurred in 1993, when plaintiff became ill. He experienced weight loss and vomited blood. During this time, plaintiff claims he "felt compelled to disclose his alternative male lifestyle to defendant, Coca Cola." On August 12, 1993, plaintiff experienced chest and stomach pains so severe as to cause him to double over in pain. That same day, Cliff Risell, defendant's Vice President of Operations, approached plaintiff's workstation from behind, and found plaintiff slumped over, apparently asleep. Risell yelled to plaintiff, at which point plaintiff jumped to his feet, and stated that he had severe chest pains. Plaintiff told Risell that he needed to go to the hospital. Risell allegedly told him, "So go." However, before plaintiff could leave the plant, Risell, accompanied by Dennis Anderson, a Local 830 shop steward, stopped him and told him he was suspended with intent to terminate for sleeping on the job and for leaving his assigned post.

During plaintiff's suspension, he claims to have been offered $5,000 with six months' benefits and six months' unemployment by Risell and John Kolb—defendant's director of human resources—if plaintiff would quit. Plaintiff alleges that he was told that, if he did not accept this offer, he would be terminated. Plaintiff decided to fight his suspension, at which point he was terminated. On December 17, 1993, after an arbitration hearing was held pursuant to the CBA, an arbitration panel ruled against defendant, finding that Risell had attempted an improper discharge of plaintiff (the "arbitration decision"). Plaintiff was reinstated with full back pay and all benefits.

Plaintiff alleges that, after being reinstated, he experienced tension with Risell and other co-workers. As evidence of this tension, plaintiff points to an event which occurred on December 23, 1993, less than a week after he was reinstated. On that date, plaintiff, a co-worker, Frank Bertchsci, and Risell were together in the employee locker room. Bertchsci got up, came over to plaintiff, made a fist, and told plaintiff to leave. Plaintiff claims that Bertchsci grabbed him, threw him against the lockers, and screamed that he would beat plaintiff badly. According to plaintiff, all of this occurred in Risell's presence, and with Risell's tacit approval. Plaintiff reported this incident to company officials, but no action was taken.

More than a year later, on January 22, 1995, plaintiff alleges that Bertchsci again threatened to physically harm plaintiff. Bertchsci, while controlling a forklift, blocked plaintiff's movement by dropping his cargo on the steps where plaintiff was working. Bertchsci told plaintiff that Bertchsci would "kick [plaintiff's] ass." Bob Taylor, a supervisor, was present for this incident, and told plaintiff and Bertchsci that if they did not stop, Taylor would fire them both. Bertchsci did not stop, though, yelling to plaintiff, "Everyone knows you're a faggot," three times, followed by, "Everyone knows you are as gay as a three dollar bill," and, "Everyone knows you take it up the ass," three times each. Later that day, Bertchsci called

plaintiff a "sissy" (the "January 22 statements"). Plaintiff reported the January 22 statements to Fran Smith, defendant's production manager supervisor. However, plaintiff claims that no action was taken.

Plaintiff also avers that he suffered a number of adverse employment actions in the wake of his winning the arbitration hearing and the January 22 statements. On January 27, 1995, Risell scheduled plaintiff for a transfer to an undesirable night shift. When plaintiff complained to Risell about this change in schedule, Risell allegedly told plaintiff that he had the "power to drop the charges and end this."

Plaintiff claims that Risell singled him out for enforcement of the rules. For instance, plaintiff states that Risell wrote him up for wearing an out-of-date version of the official uniform, an action which, according to plaintiff, Risell did not take with any other employee. Plaintiff contends that other employees often were, in a variety of ways, out of uniform, yet Risell did not discipline these other employees. However, according to plaintiff, Risell wrote plaintiff up for minor infractions of the dress code, such as having two buttons on his shirt unbuttoned. Plaintiff also alleges that Risell disciplined him for not wearing proper safety glasses, when other employees were not disciplined for the same infraction. Finally, plaintiff says that Risell would stand and watch plaintiff work, but would not do the same for other employees.

Plaintiff asserts that this unfair treatment that he suffered came not only from Risell, but also from other supervisors. He reports that on one occasion, Gene Keller, defendant's director of warehousing, stood by his workplace and yelled at him as he worked. As a result of this episode, plaintiff went to the hospital, complaining that he was suffering a nervous breakdown.

Plaintiff also claims that he was always watched more closely than other employees. For example, plaintiff states that if he arrived at work even two minutes late, his salary was docked, and that other employees were not subjected to the same scrutiny. Plaintiff also states that, although he was written up by a supervisor for having a newspaper on the factory floor, other employees were not written up for having reading materials on the factory floor.

In April, 1996, plaintiff had an accident with a forklift. Plaintiff alleges that, because Risell expedited proceedings before the safety board, the safety board heard the case in one week, whereas, according to plaintiff, it ordinarily required months. Risell asked the safety board to fire plaintiff, because he had two accidents charged against him, and company policy permitted dismissal in such cases. The safety board did not do so, and instead, charged plaintiff with a preventable accident causing $5,000 damage, which added five points to his record.[1] Plaintiff filed a grievance regarding this determination, but is unsure of the outcome. He claims the handling of the forklift case was contrary to defendant's practice not to report such actions.

In November, 1997, plaintiff complained both to defendant and to Local 830 that a coworker with low seniority had been promoted to acting foreman without posting a position, a violation of the CBA. Upon review, Local 830 agreed, and informed defendant that plaintiff was entitled to the position. However, when faced with that determination, Risell eliminated the acting foreman position. One week later, Risell reinstated the employee in an acting foreman position, and plaintiff again complained. Ultimately, the position was reassigned to another department.

Plaintiff also alleges that various graffiti containing sexual slurs was drawn in the bathroom, singling him out for his sexual

---

1. Risell testified that workplace accidents were tracked based on whether they were preventable, and how much damage oc-

curred. Employees were then charged with points based on these factors, and, if they accumulated enough points, they were fired.

preference. He claims that while other graffiti was routinely removed from the bathroom at work, the graffiti targeting plaintiff was not removed. Plaintiff states that this occurred despite the fact that he complained to Larry Norvell, the Vice President of Human resources. Finally, plaintiff contends that various members of management would follow him around at work, regardless of whether he was going from one job to another, or just to the bathroom.

As a result of the harassment he faced at work, plaintiff says he suffered from, and continues to suffer from, depression, stomach, and intestinal disorders. He went to see a psychologist, Edward Dougherty, for the depression. After interviewing plaintiff, Dr. Dougherty found that plaintiff was suffering from post traumatic stress disorder related to his experience at Coca Cola. Dr. Dougherty prescribed continuing psychological and/or psychiatric care for plaintiff, including individual therapy sessions twice a week.

## II. PROCEDURAL HISTORY

Plaintiff filed a *pro se* Complaint on January 21, 1998. This Complaint alleged violations of Title VII of the Civil Rights Act of 1965, 42 U.S.C.A. §§ 2000e–2000e–17 ("Title VII") and the Pennsylvania Crimes Code. Plaintiff, through counsel, filed an Amended Complaint on June 30, 1998, alleging, *inter alia,* violations of Title VII and a state law claim for intentional infliction of emotional distress. The Amended Complaint named not only defendant, but also a number of defendant's individual employees. On July 22, 1998, defendant filed a Motion to Dismiss All Claims in the Amended Complaint. In an Order dated November 19, 1998, this Court granted defendant's motion with respect to all of the individual defendants named in plaintiff's claims, and denied the motion with respect to defendant.

On June 24, 1999, defendant filed a Motion for Summary Judgment. On July 19, 1999, plaintiff filed a Memorandum of Law Contra the Motion for Summary Judgment. On August 16, 1999, defendant filed a Reply Memorandum to the Plaintiff's Motion of Opposition. On January 5, 2000, defendant filed a Motion for Leave to Supplement Defendant's Motion for Summary Judgment. On January 19, 2000, plaintiff filed a Reply to Supplemental Filing for Summary Judgment by the Defendant, Philadelphia Coca Cola Bottling Company. In an Order dated January 31, 2000, this Court granted defendant's motion for leave to supplement the motion for summary judgment.

## III. STANDARD OF REVIEW

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law [,]" summary judgment shall be granted. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that Rule 56(c) requires "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (citing *Anderson* and *Celotex Corp.*).

In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26

L.Ed.2d 142 (1970) (quoting *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). On the other hand, if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

## IV. DISCUSSION

### A. Count I—Plaintiff's Title VII claim

Plaintiff brings his sexual discrimination action under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C.A. § 2000e *et seq.* (West Supp.1999). Defendant argues that plaintiff's Title VII claim is appropriate one summary judgment, because plaintiff has not made out a prima facie case of discrimination. Specifically, defendant argues that plaintiff has not shown that he suffered discrimination on the basis of a protected characteristic. Although plaintiff claims he was discriminated against because of sex, defendant argues that any discrimination suffered by plaintiff was discrimination based on sexual orientation, a non-protected class under Title VII. The Court concludes that any discrimination that plaintiff suffered was based on his sexual orientation, not his sex, and, therefore, defendant's motion for summary judgment must be granted as to Count I of the Amended Complaint.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) the Supreme Court announced a basic framework for courts to follow in considering summary judgment motions under Title VII. "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of ... discrimination." Although the complaint in *McDonnell Douglas* dealt with a claim based on failure to hire, the Court noted that the "facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. 1817. When presented with a subsequent Title VII claim, the Supreme Court stated that the

central focus of the inquiry in a case such as this is always whether the employer is treating some ·people less favorably than others because of their race, color, religion, sex, or national origin....A prima facie case under McDonnell Douglas raises an inference of discrimination only because we pre-·sume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

In this case, plaintiff claims defendant created a hostile work environment on the basis of sex. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). In order to demonstrate employer liability for a hostile environment based on sex created by a co-worker, plaintiff must demonstrate that: (1) the employee belongs to a protected class; (2) the employee was subject to harassment, that is, unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment was based

on sex; (4) the harassment affected a term, condition, or privilege of employment, becoming so severe and pervasive as to create a hostile work environment; and, (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take appropriate corrective action. *See Fenton v. Hi-SAN,* 174 F.3d 827, 829–30 (6th Cir.1999); *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988); *Swentek v. USAIR,* 830 F.2d 552, 557 (4th Cir.1987). Here, the plaintiff fails this test, because he cannot show that the harassment complained of was based on sex, as is required under Title VII.

In *Oncale,* the Supreme Court had the opportunity to elaborate on the types of Title VII claims that can be "based on sex." In *Oncale,* a male employee on an oil-drilling platform was subjected to sex-related taunts, forcible sexual actions against him, and physical assaults of a sexual nature, all by male co-workers. The Fifth Circuit held that the plaintiff in *Oncale* had not alleged harassment based on sex, because Title VII did not recognize harassment by one male against another male. *See Oncale v. Sundowner Offshore Services,* 83 F.3d 118 (5th Cir.1996). The Supreme Court reversed the Fifth Circuit, holding, "Title VII prohibits discriminat[ion] ... because of sex in the terms or conditions of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements." *Oncale,* 118 S.Ct. at 1002. The Court also stated that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id.* at 1002.

However, the Court cautioned against extending the reach of Title VII too far, stating that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discriminat[ion] ... because of ... sex." *Id.* The Court added that no matter what the plaintiff's theory, "he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discriminat[ion] ... because of ... sex." *Id.* It is against this backdrop that this Court must determine whether the plaintiff has provided evidence that he has been harassed on the basis of sex.

One issue that the Court in *Oncale* did not address is whether discrimination on the basis of sexual orientation could constitute discrimination on the basis of sex for the purposes of Title VII. However, lower courts that have addressed this issue have consistently held that discrimination on the basis of sexual orientation is not discrimination on the basis of sex under Title VII. Typically, the question of whether a plaintiff could allege a claim for discrimination based on sex turns on a court's interpretation of the word "sex" in Title VII. " 'It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary common meaning.' " *See Dillon v. Frank,* No. 90–2290, 1992 WL 5436, at *4, 1992 WL 5436 (6th Cir. January 15, 1992) (quoting *Ulane v. Eastern Airlines,* 742 F.2d 1081, 1085 (7th Cir.1984)).

■ In order to determine the ordinary and common meaning of the word "sex," the Court turns to a dictionary definition. *See, e.g., Sutton v. United Air Lines,* 527 U.S. 471, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999). The *New Shorter Oxford English Dictionary* lists multiple definitions for "sex," including:

A.n. 1. Either of the two main divisions (male and female) into which many organisms are placed on the basis of their reproductive functions or capacities. . . .

4. The difference between male and female, esp. in humans. . . .

B. adj. Of or pertaining to sex or sexual activity; arising from a difference or consciousness of sex.

2 *New Shorter Oxford English Dictionary,* 2801 (Lesley Brown, ed., Thumb Index ed.1993).

The dictionary notes that the third definition above is essentially synonymous with the word "sexual." *See id.*

Applying the aforementioned principle of statutory interpretation, the Court holds that Congress intended the word "sex" in Title VII to refer to the first two definitions noted above—distinguishing between male and female-rather than the third—referring to sexual activity. As the Sixth Circuit noted in *Dillon,* one can find this intent in "the context in which [the word "sex"] was placed [in the statute], along with either immutable characteristics (race, color, national origin) and a characteristic so deeply rooted for most that it is almost immutable (religion)." *Dillon, supra,* at *4. Similarly, the Second Circuit has noted that "the other categories afforded protection under Title VII refer to a person's status as a member of a particular race, color, religion or nationality. 'Sex,' when read in this context, logically could only refer to membership in a class delineated by gender, rather than sexual activity regardless of gender." *DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 306 (2d Cir.1986). It seems clear from the context of the statute that Congress intended the word "sex" in Title VII to refer to biological distinctions rather than to sexual activity or consciousness of sex.

Two cases in this Court, and one in the District of New Jersey, all decided before *Oncale,* have discussed the distinction between discrimination on the basis of sexual orientation and discrimination on the basis of sex. In *Swage v. The Inn Philadelphia and Creative Remodeling,* Judge Shapiro of this Court noted that the "appeals courts [which] have considered whether Title VII prohibits conduct based on an employee's sexual orientation agree that it does not." No. Civ. A. 96–2380, 1996 WL 368316, at *3 (E.D.Pa. June 21, 1996). In *Hicks v. Arthur,* Judge Joyner of this

Court held that a complaint was flawed where it included "a claim of discrimination based on sexual orientation under Title VII although [sexual orientation] is not a protected class [under Title VII]." 891 F.Supp. 213, 215 (E.D.Pa.1995). Finally, most recently, in the District of New Jersey, a court noted that sexual harassment based on sexual orientation "it is clear, would not be actionable under Title VII." *Caldwell v. KFC Corp.,* 958 F.Supp. 962, 967, n. 2 (D.N.J.1997).

Since *Oncale,* a number of other courts around the country have had the opportunity to consider whether *Oncale* affected the analysis of sexual orientation as a protected class. Those courts to consider the issue have consistently held that sexual orientation is not a protected class, even in the wake of *Oncale. See, e.g., Klein v. McGowan,* 36 F.Supp.2d 885, 889 (D.Minn. 1999) ("However, it is well settled that Title VII does not recognize a cause of action for discrimination based on sexual orientation"); *Metzger v. Compass Group U.S.A.,* No. Civ. A. 98–2386–GTV, 1999 WL 714116, at *2 (D.Kan. September 1, 1999) ("Harassment based solely on a person's sexual preference or orientation is not protected by Title VII."); *Higgins v. New Balance Athletic Shoe,* 21 F.Supp.2d 66, 73 (D.Me.1998) (Title VII does not recognize "a cause of action for any type of discrimination based on sexual orientation.").

In *Salvatore v. KLM Royal Dutch Airlines,* No. 98 Civ. 2450(LAP), 1999 WL 796172 (S.D.N.Y. September 30, 1999) ("*KLM* "), the court held that the Supreme Court's holding in *Oncale* had done nothing to overturn those cases upholding a distinction, for the purposes of Title VII, between discrimination based on sex and discrimination based on sexual orientation. *See id.* at *12. *KLM* dealt with a number of Title VII claims, including one on the basis of sexual orientation discrimination. The court held that "harassment based on a plaintiff's sexual orientation, as opposed to a plaintiff's sex, is not covered by Title

VII." *Id.* In reaching this conclusion, the *KLM* court relied on the fact that the *Oncale* Court confined its analysis to the language of Title VII requiring the discrimination to be based on sex, and "left undisturbed that line of cases finding that discrimination based on sexual orientation is not discrimination based on sex and thus does not state a claim under Title VII." *Id.*

Similarly, in *Higgins,* a plaintiff argued that the discrimination that he suffered based on his sexual orientation constituted discrimination on the basis of sex. The court in *Higgins* considered Title VII's coverage of discrimination on the basis of sex, as it has been defined by other courts, on the one hand, and discrimination on the basis of "gender"—a concept in which "because of sex" would encompass "personality features and socio-sexual roles typically associated with 'masculinity' or 'femininity,'" on the other, and rejected the gender approach. *See Higgins,* 21 F.Supp.2d at 75. In holding that Title VII required an interpretation of the word "sex" in a more traditional manner, the *Higgins* court stated, "In its current form, Title VII does not provide a remedy to persons who have experienced harassment motivated solely by animus toward the plaintiff's sexual orientation." *Id.*

This Court agrees with the above cases and holds that although the Supreme Court's decision in *Oncale* has made clear that same sex discrimination is actionable under Title VII, the decision has not expanded the reach of Title VII to include discrimination on the basis of sexual orientation. The Court now turns to the remaining question—whether the behavior described by plaintiff in this case constitutes discrimination on the basis of sex or discrimination on the basis of sexual orientation.

In *Carreno v. Local Union No. 226, International Brotherhood of Electrical Workers,* No. Civ. A. No. 89–4083–S, 1990 WL 159199 (D.Kan. September 27, 1990), a

district court was presented with a case of insults to an open homosexual similar to those in this case.[2] The court in *Carreno* concluded that these insults were based on sexual orientation—the fact that plaintiff was a homosexual—rather than sex—the fact that plaintiff was a male. *See id.* at *3. Such comments, the court ruled, were not within the ambit of Title VII. *See id.*

■ Like the court in *Carreno,* this Court concludes that plaintiff's claim of sexual harassment under Title VII is based upon sexual orientation discrimination. In *Oncale,* the Court stated that the critical issue in evaluating whether harassment has occurred on the basis of sex is "'whether members of one sex are exposed to conditions of employment to which members of the other sex are not exposed.'" 118 S.Ct. at 1002. In this case, plaintiff points to only three statements of a sexual nature, the January 22 comments, and the graffiti. The January 22 comments, all involved a co-worker telling the plaintiff, an open homosexual, "everyone knows you're a faggot;" "everyone knows you are as gay as a three dollar bill;" and, finally, "everyone knows you take it up the ass." Certainly, these comments are not pleasant, and are inappropriate. Nonetheless, they are not actionable under Title VII, because they all are clearly targeted at the plaintiff's sexual orientation, and not at his sex.

Similarly, the graffiti in the bathroom of which plaintiff complains said, "Some fagget [sic] keeps pulling this away from the wall to see some dick," followed by, "Yeah, yours," on the wall. Again, the language and context are unpleasant, but the graffiti is clearly aimed at sexual orientation, rather than at plaintiff's sex. Because none of these statements indicate that plaintiff is exposed to conditions of employment different from members of the opposite sex, as the *Oncale* Court requires, this Court grants defendant's motion for summary

---

**2.** In *Carreno,* the court found that the plaintiff had been subjected to "derogatory comments

such as 'Mary' and 'faggot.'" *Carreno, supra,* at *1.

judgment as to Count I of the Amended Complaint.

## B. Count II—Plaintiff's intentional infliction of emotional distress claim

In Count II of his Amended Complaint, plaintiff asserts a state law intentional infliction of emotional distress claim against defendant. Plaintiff alleges that Coca–Cola's conduct is sufficiently outrageous to justify such a claim. Defendant argues that such a claim is appropriate for summary judgment because the claim is preempted by federal labor law, specifically §§ 7–8 of the National Labor Relations Act ("NLRA")[3] and § 301 of the Taft Hartley Act. Defendant also argues that the claim is time-barred under the applicable statute of limitations, and that the conduct in question does not rise to the level of outrageousness required by Pennsylvania law.

Plaintiff responds that his claim is not preempted by federal labor law, because Title VII is not preempted by federal labor law.[4] Plaintiff also argues that the claim is not time-barred, because plaintiff has alleged some incidents that occurred within the two-year statute of limitations, and that, under the continuing violation exception to the statute of limitations, all of defendant's conduct is relevant. Finally, plaintiff argues that defendant's conduct does rise to the level of outrageousness required by Pennsylvania law.

■ Defendant has presented evidence that all of plaintiff's claims are based on retaliation for conduct protected under the NLRA and are therefore preempted. Plaintiff argues that some of his claims are based on retaliation and that others are based on sexual discrimination (or, as the Court has found, discrimination related to sexual orientation). Because the Court declines to exercise supplemental jurisdiction over the Count II of the Amended Complaint, pursuant to 28 U.S.C. § 1367(c)(3), it need not decide this issue. The Court will, however, comment on the preemption defense.

In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court considered a claim that the NLRA preempted a California law. The Court held that, in passing the NLRA, Congress intended to "confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order." *Id.* The specific and specially constituted tribunal to which the *Garmon* Court was referring is the National Labor Relations Board ("NLRB").

■ Retaliation for the exercise of a protected right under the NLRA is within the exclusive jurisdiction of the NLRB. *See New Orleans Cold Storage & Warehouse*, 326 N.L.R.B. No. 161, 1998 WL 723988. To prevail on a retaliation claim, plaintiff must prove that the exercise of a protected right was a substantial or motivating factor in defendant's alleged retalia-

---

**3.** § 7 of the NLRA, 28 U.S.C.A. § 157 (West Supp.1999), provides that:

"Employees shall have the right to self-organization, to form, join or assist labor organizations, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...."

§ 8 of the NLRA, 28 U.S.C.A. § 158 (West Supp.1999) provides, in relevant part:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; ...

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

**4.** Plaintiff makes no argument as to whether federal labor law preempts a state intentional infliction of emotional distress claim, however.

tory conduct. *See Mt. Healthy City School Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Although *Mt. Healthy* dealt with a constitutional claim of retaliation, it has been applied to claims under the NLRA as well. *See Webster v. Dept. of the Army*, 911 F.2d 679, 696 (Fed.Cir.1990) (citing *National Labor Relations Bd. v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983)).

In his Amended Complaint, plaintiff alleges that a coworker made a harassment charge against plaintiff "solely to punish Plaintiff for attempting to enforce seniority and job posting rules." Amended Complaint, ¶ 33. During his deposition, plaintiff repeatedly stated that the disparate disciplinary treatment that he faced resulted from his asserting his rights under the CBA. However, plaintiff does not mention a claim for retaliation in his Amended Complaint, and it is unclear exactly which of defendant's actions plaintiff perceives to have been in retaliation for exercising his rights under the CBA, and which actions he perceives to have been aimed at his sexual orientation. The Court also notes that there is a paucity of evidence on the claimed link between the harassment and the exercise of a protected right.

Under 28 U.S.C. § 1367 ("§ 1367"), a district court may decline to exercise its supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction...." 28 U.S.C.A. § 1367(c)(3) (West Supp.1999). In interpreting this provision, the Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendant state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995).

The Court concludes that no affirmative justification to retain jurisdiction over the state law claim is present in this case. Because the Court is granting summary judgment as to the only federal claim, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claim of intentional infliction of emotional distress.

## V. CONCLUSION

The Court concludes that plaintiff's Title VII claim is premised on sexual orientation discrimination. Because sexual orientation is not a protected class under Title VII, the Court grants defendant's Motion for Summary Judgment as to Count I, and enters judgment in favor of defendant and against plaintiff on Count I of the Amended Complaint. The Court declines to exercise supplemental jurisdiction over plaintiff's state law claim for intentional infliction of emotional distress, and therefore dismisses that claim without prejudice.